Trask et al. v. State.

2. When a witness, who has been in attendance during the progress of a trial, fails to appear when called, the court will not reverse a judgment for that cause—no motion having been made to postpone the case or procure the testimony of the witness, *de bene esse*, and especially when it appears that the evidence of the witness, had he been present, would have been only cumulative.

Error to the Supreme Court.

See case reported, 1 *Vroom* 378.

Argued by—

*J. G. Shipman*, for plaintiff in error.

*D. A. Depue*, for defendant.

---

ALANSON TRASK, CHARLES D. BIGELOW, AND WALTER B. BIGELOW v. THE STATE OF NEW JERSEY.

The statute (*Nix. Dig.* 815, § 7,) providing that the keeper of the state prison may contract for the labor of the prisoners, was intended to give him power to contract for the term of his official existence, and a contract to last for a longer term is not binding, either on his successors or the state.

In error to the Supreme Court.

This was an action of *assumpsit*, brought by the State of New Jersey (defendant in error) against Alanson Trask, Charles D. Bigelow, and Walter B. Bigelow (the plaintiffs in error,) by a writ of summons, issued out of the Supreme Court, tested March 17th, 1864, and returnable April 4th, 1864.

The declaration contains the common count for goods sold and delivered; work and labor done and performed; money lent and advanced, &c. The plea *non assumpsit*.

Afterwards, on the twenty-fourth of June, 1864, the parties agreed upon the following state of the case, viz.:

It is agreed between the parties in this action, that it shall be deemed and considered that the issue joined between the parties came regularly on to be tried before the Circuit Court in and for the county of Mercer, at the April Term thereof, in the year of our Lord one thousand eight hundred and sixty-four, (*pro ut* the pleadings.)

That at said trial it was fully proved, on the part of the plaintiff, that the said plaintiff, at the instance and request of the defendants, had furnished them with the labor of two hundred and fifty prisoners and upwards, at the state prison of New Jersey, from the first day of December, 1861, up to the day of the commencement of this suit, viz., on the seventeenth day of March, 1864, which, at the rate of thirty-one cents a day for each prisoner whose labor was thus furnished, after having worked for six months for said defendants, and at the rate of twenty cents per day before so working for six months, amounted to the sum of ———, that by increasing the rate of the wages of said labor, from the fifth day of October, 1863, up to the said day of the commencement of this suit, to thirty-five cents instead of thirty-one cents a day for each prisoner whose labor was thus furnished, after having worked for six months as aforesaid, and to thirty-one

cents, instead of twenty cents a day, before so working for six months, the aggregate of said wages would amount to the sum of ————, and that the first above specified rates, in the absence of any agreement, were a. reasonable and fair compensation for the labor aforesaid, from the first day of December, 1861, to the fifth day of October, 1863; and that the last above specified rates were a reasonable and fair compensation for the labor aforesaid, between the said fifth day of October, 1863, and the day of the commencement of this suit. And it was admitted by said plaintiff that said defendants had paid for said wages, furnished as aforesaid, the said sum of ————, but no more; and said plaintiff claimed the difference between that sum and the said sum of ————, to wit, the sum of four thousand nine hundred and seventeen dollars and ninety-eight cents.

The plaintiffs having rested, the defendants, on their part, duly proved, and offered and read in evidence, an article of agreement made and entered into between them and Robert P. Stoll, a former keeper of said state prison, with the consent of the inspectors, of which the annexed is a copy, and then proved that the said labor was furnished to them, under that agreement, from the aforesaid first day of December, 1861, to the aforesaid fifth day of October, 1863, on or about which day it was claimed in behalf of the state that said agreement was not then a valid and binding agreement on the plaintiff; and that, in consequence of such claim on the part of the state, an agreement was entered into, to the effect that subsequent to that day, and up to the day of the commencement of this suit, the rate of wages should be increased as above stated, if it should be judicially determined that said agreement was not then valid; but if it should be so determined that said agreement was then valid, there should be no increase in the rate of said wages first above mentioned.

It was also proved and admitted by the parties, that Robert P. Stoll, the keeper of said state prison mentioned in said article of agreement, went out of office in the spring of

1862, and that his successor, Tunis V. D. Hoagland, was keeper but one year, and went out of office in the spring of 1863; that his successor, Joseph B. Walker, after having served his first term, was afterwards duly appointed for a second year, and is now the keeper of said state prison.

It was also proved and admitted by the said parties, that the furnishing of said labor as aforesaid, under said agreement, in no wise interfered with the discipline and regulations of said prison.

It is further agreed between the parties, that the above statement shall be deemed and considered as a special verdict, with power in the court to make all legal presumptions therefrom; provided that, if the court shall be of opinion that the aforesaid article of agreement was not binding on the plaintiff for the four years mentioned therein, then no presumption of its confirmation or adoption thereof, shall be made for its continuance beyond the aforesaid fifth day of October, eighteen hundred and sixty-three; and if the court shall be of opinion that said agreement was and continued binding on the parties to the day of commencing this suit, they shall give judgment final thereon for the said defendants; but that if the court shall, on the contrary, be of opinion that said agreement did not so continue binding, then they shall give judgment for the plaintiff for the said sum of four thousand nine hundred and seventeen dollars and ninety-eight cents, with costs.

The argument, having been duly noticed, came on to be heard before the Supreme Court, at the February Term thereof, 1865, and was argued before said court by the counsel of the parties, respectively, at the term; and that court, having considered the same, the following opinion was delivered by

VREDENBURGH, J. It appears, by the case submitted, that on the twenty-fifth November, 1861, Mr. Stoll, the then keeper of the state prison, by agreement farmed out to the

defendants the labor of two hundred and fifty prisoners, for four years, from the first of December, 1861, at prices therein specified. Stoll went out of office in the spring of 1862, and was then succeeded by Mr. Hoagland, who in turn was succeeded by J. B. Walker, the present incumbent, in the spring of 1863.

The different keepers and the defendants went on under the contract until the fifth of October, 1863, when it was claimed, on behalf of the state, that the said agreement was not then binding on the state, and an agreement was then entered into between Walker and the defendants, that the rate of wages should be increased, if it should be judicially determined that said agreement was not then valid.

The validity of the contract on the fifth of October, 1863, is claimed by the defendants under the statute. (*Nix. Dig.* 815, § 7.) This provides, among other things, that the keeper may, with the consent of the acting inspectors, contract with any persons for the labor of the prisoners. The difficulty is as to the construction of this clause. The state insists that it was intended to give the keeper power to contract only for the term of his official existence. The defendants insist that it gave to him authority to contract not only during his own, but also during the official life of his successors indefinitely.

I do not see how there can be the slightest doubt as to the intent of the act. The act gives power to every keeper to contract—whoever is keeper for the time being may contract. Mr. Walker was keeper on the fifth of October, 1863, and he had then power, by the very terms of the statute, to contract, and did make a new contract then. This power in the existing keeper is entirely inconsistent with the binding influence of a contract made by a former keeper. The power of the two cannot co-exist together. Either the keeper for the time being cannot contract when the statute says he may, or the former keeper cannot make his contract binding on his successors. In order to hold the contract binding on

his successors, we must repeal the very clause under which the power of a former keeper is claimed.

That the legislature never intended, by the clause in question to give any keeper power to bind his successors by any such contract, is also apparent from the whole scope and object of the said seventh section, *as well as from all legislation upon the subject of the state prison.*

Thus the keeper is a constitutional officer, who holds under a term of only one year. He cannot exercise the powers or duties of a successor without exercising them unconstitutionally. One of the principal duties of a keeper is to oversee and regulate the labor of the prisoners. A predecessor cannot intrude himself into the prison, and say that prisoners shall labor as I prescribe.

And yet it is contended here, that although a former keeper has no business in the state prison unless he is duly sent there by the Oyer, yet he can, in substance, regulate all the labor of the prisoners, for all future time, by his agents, the contractors. A law which would force the keeper for the time being, to submit and regulate himself by the mode of regulating the labor of a prior keeper, would be a clear infringement of the constitution, by changing the office from a yearly to a perpetual one.

But the scope of the whole law in relation to the state prison plainly indicates that the legislature could have had no such intent. It speaks and provides only for the duties of existing keepers. Thus section seven, *Nix. Dig.* 813, is entitled " of the principal keeper and his duties," and then goes on defining them. Among others, it provides that he shall provide stock for the prisoners to work upon, and to make contracts for clothing and provisions. Was it ever supposed that one keeper could, in these matters, bind his successors indefinitely ? So, again, it provides that the keeper for the time being may contract for the sale of all articles manufactured by the prisoners.

Was it ever supposed that any keeper for the time being could, under this clause, contract for the sale of all articles

manufactured by the prisoners, not only during his own official life, but also for all time indefinitely? If we should so construe it, the office of keeper would lose all the characteristics of an annual office under the control of the legislature. A new keeper would be one in name only, with no duties, powers, or discretion. So throughout the whole of this long section, it speaks only of the duties of the keeper during his official life.

But again, one of the chief duties of the keeper is to keep the prisoners in solitary confinement at hard labor, and provide the necessary means and materials for them to labor on and with. This is made *imperative* by the statute, and can necessarily only be done by the keeper during his term of office. When a new keeper is inducted, the old one necessarily ceases to have any control over the labor of the prisoners. The statute allows the keeper for the time being to contract for the labor of the prisoners. But this was only allowed in place of his own personal employment of them, and was intended to last no longer. It merely covers the place of his own personal employment of them.

So again, this seventh section provides that the keeper may appoint agents for the sale of articles manufactured. It does not say how long the appointment is to last. Suppose he should appoint them for four years, would it bind his successor? and yet why not, if this one does? In fine, if the doctrine the defendants contend for be true, the person appointed this year by the legislature will indeed be the nominal keeper, but the real one will be some one who was appointed perhaps a dozen years back.

In this whole section there is no duty prescribed which does not contemplate its being done by the keeper for the time being. So when it prescribes that the keeper shall receive and keep the prisoner, does it mean that the prisoner is to be kept by the same keeper who received him, or by each keeper, as he succeeds to the office? So when it prescribes that the keeper shall visit the cells twice a week, or

keep a journal, or not absent himself from the prison, or furnish the prisoners with books, or receive money for articles sold, or sell articles manufactured, or, as is the case before us, contract for the labor of the prisoners, it always and only contemplates acts done by the keeper for the time being; and the simple fact that this section gives these powers and duties, and vests this discretion in each keeper, or any keeper, and attaches them to the office, necessarily, as we have before remarked, limits the power of each one to his own official existence.

I am of opinion that the only object of this clause was, instead of insisting that the keeper should himself procure the material to be manufactured, and attend to the labor of the prisoners personally, to give him the privilege of putting the labor of the prisoners out by contract, and that the one mode of managing such labor of the keeper was to endure no longer than the other.

And thereupon the said Supreme Court, in pursuance of said agreement, gave judgment for said plaintiff below for the sum of four thousand nine hundred and seventeen dollars and ninety-eight cents, besides costs, (*pro ut* the record.)

The said defendants below at once brought a writ of error removing said judgment into this court, and have assigned for error as follows, viz.:

That the said article of agreement, made and entered into between them, the said Alanson Trask, Charles D. Bigelow, and Walter B. Bigelow, plaintiffs, with said Robert P. Stoll, a former keeper of the state prison of New Jersey, was, at the time of the making thereof, a valid and binding agreement between the parties, and so continued up to the day of the commencement of said action; and that, therefore, judgment should have been given for said plaintiffs, instead of for said defendant.

And also there is error in this, that the judgment afore-

said, by the record aforesaid, appears to have been given for the said defendant against the said plaintiffs; whereas, by the law of the land, the said judgment ought to have been given for the said plaintiffs against the said defendant.

The defendant in error filed the common joinder in error.

The case was argued at the term of March, 1865, by—

*A. Browning* and *B. Williamson*, for plaintiffs in error, and

*E. W. Scudder* and *F. T. Frelinghuysen*, Attorney-General, for defendant.

The court having heard and considered the arguments of counsel, and being equally divided in opinion, four of the judges being in favor of reversal and four in favor of affirmance, upon application of the plaintiffs in error, it was ordered that a re-argument should be had at the term of June then next; at which term, the parties having been again heard by their respective counsel, the following opinion was pronounced as the opinion of the court, by

GREEN, C. The question is not whether the state can be sued upon this contract. It may be assumed that no action can be maintained against the state upon any contract, without at all affecting the question under consideration. Nor should any weight whatever be given to the suggestion, that it would be a virtual repudiation of her contract by the state to hold that there is no valid contract. The state, by its legal advisers, have agreed to refer the question to the tribunal of justice, to decide whether there is a valid contract by which, in justice, the state ought to be bound. If there is, judging from all her past history, she will perform it. If there is not any contract binding upon the state, it is still in the breast of the legislature whether she will or will not do what, under the circumstances, justice and equity re-

quire. Nor is it a material question, whether the keeper should or should not have power to make a contract, extending beyond the limits of his term of office. Such power will often enable the state to make more advantageous contracts in a pecuniary point of view.

It is certainly clear, that if the keeper have power to make such contract, and the contract is valid, it is binding, not upon the keeper, but upon the state. The only question which, by the state of the case, is submitted for the determination of the court is, whether the contract in question is authorized to be made by any power conferred on the keeper of the state prison. The keeper exercises a special statutory authority. The power he has is conferred exclusively by the act for the government and regulation of the state prison, approved April 16th, 1846, (*Nix. Dig.* 815, § 7,) by which it is enacted that he may, with the consent of the acting inspectors, contract with any person or persons for the labor of the prisoners, or any part of them. The power, in terms, is very broad. It has no limitation in regard to the persons with whom, or the time for which the contract may be made, the place where the labor is to be performed, the character of the labor, or the number of prisoners to be employed. It is clear, that the terms of the enactment are broad enough to authorize the contract in question, or a contract for any length of time whatever. And yet it is obvious, from a perusal of the statute, that the clause must be taken with many limitations, necessarily to be inferred from the object and the express provisions of the act. Thus it is clear that no contract could legally be made 'for the labor of the prisoners without the limits of the state, because such contract would require the prisoners to go out of the state, beyond the limits of its sovereignty, and beyond its jurisdiction and control. Nor could any contract be made for the labor of the prisoners upon any railroad or canal, however beneficial such contract might be, because it would require them to go without the walls of the prison, and would conflict directly with that provision of the statute which requires the keeper

to keep the prisoners in the said prison, "according to the law of the state, and the rules and regulations of the prison, until he is discharged, according to law." Nor could the keeper, under the provisions of the original act of 1846, enter into any contract for the associated labor of the prisoners, because, by the terms of that act, the keeper was required to keep the convict at labor in his cell. The whole structure of the act looks to solitary confinement, as the only mode of punishment and reformation. It was not until the act of 1858 that the keeper was authorized to take the prisoners from their cells, for the purpose of associated labor. Nor could they be employed at labor injurious to the health of the prisoners, for it would conflict with the whole spirit and policy of the act.

These are limitations of the general power, necessarily growing out of the provisions of the statute for the discipline and government of the prisoners. They show clearly that the general terms of the power conferred must necessarily be limited by the manifest design and clear terms of the statute.

I think it is clear, from the provisions of the act, that there must also be a limitation as to the time during which the contract may be made to extend. The contract for the employment of the prisoners is not a contract merely for the sale of their services, and the question involved is not a mere question how much pecuniary advantage can be extracted from their labor. An important trust is committed to the keeper and inspectors, touching the care and government of the inmates of the prison. They are to have regard to the physical, mental, moral and religious culture of the prisoners. They are to see that undue tasks are not exacted from them. Each convict is to be employed by the keeper, and at his discretion, with the approval of the inspectors, every day except Sundays, as far as may be consistent with their sex, health, age, and ability, strictly at hard labor of some sort, in which the work is least liable to be spoiled by ignorance, neglect, or obstinacy, and in which the materials cannot be easily embezzled or destroyed. These trusts are

Trask et al. v. State.

reposed in each keeper, and in each board of inspectors. The trust is committed to them to be executed according to their judgment and cannot be delegated to others. To permit a keeper to make a contract for a term of years, for the labor of all the able-bodied prisoners in the institution, must necessarily interfere with the full, free, and faithful discharge of the duties of their office. It is not because the keeper cannot, under the terms of the statute, make any contract extending beyond his term of office, but because, as is clearly shown in the opinion of the Supreme Court, the binding power of such contract must inevitably interfere with the discharge of the duties of their office, by the acting keeper and inspectors.

It is essential, in order to carry the provisions of this act fairly into effect, and to leave to each keeper and board of inspectors the full and unrestrained exercise of the power conferred on them by the statute, that the power of the keeper to make contracts for the labor of the prisoners must, necessarily, be limited to his term of office. That it was so designed to be limited, is apparent from the fact that each convict is to be kept at labor by the *keeper for the time being.* And when the act gives to the keeper, with the consent of the inspectors, the power of contracting for the labor of the prisoners, it must be intended that labor, and that labor only, which the act intrusted to his control and direction. The act gives to the keeper no power to control or regulate the labor of the prisoners, except during his term of office, and it is fairly to be inferred that it was that labor only for which the keeper was authorized to contract.

I am of opinion that the keeper had no power to make an executory contract for the labor of the prisoners binding upon the state, extending beyond his term of office, and that the judgment of the Supreme Court should be affirmed.

*For affirmance*—BEDLE, CORNELISON, ELMER, GREEN, C., KENNEDY. 5.

*For reversal*—CLEMENT, FORT, VAIL, WALES. 4.